RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0241p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT



SAMUEL FIELDS,

        *Petitioner-Appellant,*

    *v.*

SCOTT JORDAN, Warden,

        *Respondent-Appellee.*

No. 17-5065

On Petition for Rehearing En Banc
United States District Court for the Eastern District of Kentucky at Pikeville.
No. 7:15-cv-00038—Karen K. Caldwell, District Judge.

Argued En Banc: June 14, 2023

Decided and Filed: November 3, 2023

Before: SUTTON, Chief Judge; BATCHELDER, MOORE, CLAY, GIBBONS, GRIFFIN, KETHLEDGE, STRANCH, BUSH, LARSEN, NALBANDIAN, READLER, MURPHY, DAVIS, and MATHIS, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED EN BANC:** Daniel E. Kirsch, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Kansas City, Missouri, for Appellant. Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, for Appellee. **ON SUPPLEMENTAL BRIEF:** Daniel E. Kirsch, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Kansas City, Missouri, for Appellant. Matthew F. Kuhn, Jenna M. Lorence, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, for Appellee. **ON AMICUS BRIEF:** J. Matthew Rice, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Amicus Curiae.

MURPHY, J., delivered the opinion of the court, in which SUTTON, C.J., and BATCHELDER, GIBBONS, GRIFFIN, KETHLEDGE, BUSH, LARSEN, NALBANDIAN, and

_____

[*]Judge Batchelder, who sat on the original panel, participated in this decision pursuant to 6 Cir. I.O.P. 35(c), Judge Thapar recused himself, and Judge Bloomekatz, who was confirmed on July 18, 2023, did not participate.

READLER, JJ., joined.  MOORE, J. (pp. 36–49), delivered a separate dissenting opinion, in which CLAY, STRANCH, DAVIS, and MATHIS, JJ., joined.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.  A state jury convicted Samuel Fields of breaking into an elderly woman's home, slashing her throat, and stabbing a knife through her head.  The police found Fields next to the woman's body, and he confessed to killing her.  At trial, the prosecution argued that Fields got into the woman's home by unscrewing a porch window with a certain knife that was admitted into evidence; the defense countered that Fields could not have conducted this feat because he was intoxicated at the time of the crime.  During deliberations, the jury used this knife to unscrew the screws on a jury-room cabinet.  It found Fields guilty and sentenced him to death.  Fields later alleged that the jury's "experiment" with the knife violated the Constitution.  The Kentucky Supreme Court disagreed, and a federal district court denied Fields habeas relief.

Fields renews this jury-experiment claim, among others, on appeal.  For well over a century, lower courts have debated when jury experiments of this type violate state or federal law.  But one court has yet to enter this debate: the U.S. Supreme Court.  That fact dooms Fields's claim in these proceedings.  Under the Antiterrorism and Effective Death Penalty Act (AEDPA), we may not grant habeas relief unless a state court has unreasonably applied "clearly established Federal law, as determined by the Supreme Court[.]"  28 U.S.C. § 2254(d)(1).  Because the Court has not identified any principles to distinguish proper from improper jury experiments, Fields cannot show that the experiment in his case violated "clearly established" law from the Supreme Court.  His other claims also cannot overcome AEDPA's standards.  We thus affirm the denial of habeas relief.

I

A

In the summer of 1993, Fields was 21 years old.  He lived with his mother and brother at an apartment in Grayson, a small town in eastern Kentucky.  That August, Fields began dating Minnie Burton.  Burton lived a short distance from Fields in a duplex apartment.

Bess Horton, an 84-year-old widow, owned the duplex where Burton lived.  Horton allowed Burton to act as her "driver" and run errands for her in lieu of paying rent.  Yet Burton repeatedly took Horton's car without permission—one reason why the two women had a falling out.  By mid-August, Horton had started the process of evicting Burton and asked Elmer Pritchard, the neighbor in the duplex's other apartment, to change the locks.

On August 18, Fields and Burton spent the day driving around eastern Kentucky with friends, including Phyllis Berry.  Most of the group, including Fields, drank beer throughout the day.  But Berry, who joined the group late, did not participate in the drinking because she took over as the primary driver.  With Berry behind the wheel in the evening, the group made two more beer stops.

After the first stop, Berry drove the group to her brother's home.  While there, witnesses saw Fields take "horse tranquilizers," a slang term for the hallucinogen PCP.

Around 11:30 p.m. or so, Berry drove Fields and Burton back to Fields's apartment. Fields and Burton continued to drink beer with Fields's brother.  Berry described Fields as "intoxicated" at this time; Fields's brother said that Fields "had a good buzz going" and seemed "rowdy" and "ready to fight[.]"  Berry Tr., R.30-17, PageID 6584; J. Fields Tr., R.30-19, PageID 6831, 6839.  Berry soon left, and Fields's brother went to bed shortly after.

While alone with Burton, Fields suddenly "freaked out," claiming to lack "control" of his conduct.  Burton Tr., R.30-18, PageID 6685.  He started throwing things.  Fields, for example, threw a knife from his location in the kitchen close to where Burton stood in the living room. His erratic behavior scared Burton, so she decided to leave for her duplex apartment.  Burton could not recall the specific time that she departed.

Fields's brother made out the sounds of an argument between Fields and Burton while trying to sleep in his upstairs bedroom. He thought Burton had left around midnight. After later hearing shattering glass, Fields's brother went downstairs to investigate. The apartment was in disarray. A table had been flipped over, a storm-glass window had been broken, and the walls had holes in them. Fields remained at the apartment. He held a large butcher knife and started "rubbing it up and down [his brother's] arm." J. Fields, R.30-19, PageID 6823–24. Fields eventually walked off toward Burton's duplex. His brother gave contradictory answers about when Fields left. At points, he suggested that Fields left 10 to 20 minutes after Burton; at other points, he suggested that Fields did not leave until 1:30 a.m.

In the meantime, Burton had made it back to her apartment. Burton found herself locked out. Though she had the keys to her apartment, she could not get in because the storm door was locked. Rather than ask Pritchard in the other duplex apartment for help, she decided to pass the time smoking on the front porch. She later began to check her windows to see if any were unlocked. When doing so, she heard someone "hooting and hollering" and banging on street signs. Burton Tr., R.30-18, PageID 6691–92. Fields materialized out of the thick fog, handed her a knife, and claimed (falsely) to have killed his brother. He took Burton's keys and vowed to get inside her apartment. She dropped the knife and fled to a relative's home. Fields then punched out a window of Burton's apartment—cutting himself and leaving his blood on the window.

Around 1:55 a.m., Pritchard heard this window shatter. He feared that somebody was breaking into Burton's apartment. Looking outside, Pritchard saw Fields cussing and yelling "Minnie, why did you run for?" Pritchard Tr., R.30-19, PageID 6880. Pritchard called the police to report the break-in and watched Fields leave in the general direction of Bess Horton's home.

Officer Larry Green with the Grayson Police Department quickly reached the scene. Pritchard let Green into Burton's apartment, and they searched it together. The pair found nobody inside but spotted the bloody, broken window. Green called for backup and met Sergeant Ron Lindeman at 2:23 a.m. Pritchard told the officers that Burton was renting the apartment from Horton and that Fields had walked off in the direction of Horton's home.

The officers started to search the area.  Retracing Fields's path, they eventually found themselves near Horton's home.  One of the garage doors to her standalone garage was up.  Nobody was in the garage, but the regular door out the back appeared to have been kicked open.  The officers walked through this door to the back of Horton's home.  Lights were on.  Growing increasingly alarmed, Lindeman could not "recall [Horton's] lights ever being on that late at night."  Lindeman Tr., R.30-14, PageID 6039.  The officers looked through the enclosed back porch and saw an "L-shaped cut" on the screen to Horton's bedroom window.  *Id.*, PageID 6040.

Instructing Green to stay put, Lindeman headed to the front of the house.  While looking into a lighted room in the back, Green spotted Fields rummaging through something.  Now at the front of the house, Lindeman saw a large "aluminum window laying up against the pillar of the porch" with its screws scattered nearby.  *Id.*, PageID 6044.  He entered Horton's home through the opening where this window had been.

Lindeman slowly moved to the back of the house.  As he approached Horton's bedroom, he saw her brutalized body on the bed.  "Her throat was slashed, and she was stabbed in the head with such force that the knife buried to the hilt in her right temple and the point of the blade protruded from her left temple."  *Fields v. Commonwealth*, 12 S.W.3d 275, 277 (Ky. 2000).  Lindeman called for Green and more backup.

Lindeman then entered Horton's bedroom where Fields was "going through" a drawer.  Lindeman Tr., R.30-14, PageID 6046.  He told Fields to put his hands up.  Fields responded nonchalantly: "Hi Ron.  How you doing?"  *Id.*  But Fields soon frantically confessed, exclaiming: "Kill me, Ron, just kill me. . . .  I stabbed her, and I'm into it big time this time."  *Id.*, PageID 6048.  Lindeman asked Fields how he could do such a thing.  Fields stated: "I don't know.  I just did it.  Kill me.  I'm going to prison for the rest of my life."  *Id.*  Green reached the room in time to hear Fields's confession.  He recalled Fields telling Lindeman: "Kill me.  Shoot me.  I'm into it deep.  I killed her."  Green Tr., R.30-13, PageID 5950.

Although Fields first appeared calm, he "got into a scuffle" with the officers once they tried to handcuff him.  Lindeman Tr., R.30-14, PageID 6048.  Lindeman "could smell a strong odor of alcohol" and found Fields "pretty tough to handle."  *Id.*  Fields had blood on him and

jewelry in his pockets.  The officers also noticed that he possessed many knives and straight razors.  Critically for this appeal, one of these knives was a "butter knife" with a "missing" tip—what the prosecutors would call the "twisty knife" at Fields's trial.  Green Tr., R.30-13, PageID 5953; Opening Tr., R.30-13, PageID 5908.

The police took Fields to a hospital.  An emergency medical technician treated Fields in the emergency room.  This technician asked Fields where the blood had come from.  Fields responded "in no uncertain terms" that if the technician "had killed some lady that [he] would have blood on [him] as well."  Dobson Tr., R.30-15, PageID 6163.  As it turns out, however, DNA testing identified only Fields's own blood (not Horton's) on his clothes.

B

Kentucky charged Fields with murder and first-degree burglary.  A jury convicted Fields and sentenced him to death.  *Fields*, 12 S.W.3d at 277.  But the Kentucky Supreme Court reversed on two grounds.  First, the trial court had wrongly admitted a "dramatic videotaped reenactment" that Lindeman made to summarize his investigation.  *Id.* at 278–82.  And second, the trial court had wrongly refused to give a lesser-included-offense instruction about second-degree manslaughter.  *Id.* at 282–83.  The Kentucky Supreme Court remanded for a new trial. *Id.* at 285.

At Fields's second trial, the parties debated whether Fields or Burton committed Horton's murder.  The prosecution presented a simple case.  The officers "caught" Fields right next to Horton's body while burglarizing her home.  Opening Tr., R.30-13, PageID 5887.  Fields also confessed to the murder three times.  The prosecution surmised that Fields got into Horton's home by unscrewing 17 screws from the window on her front porch.  It suggested that Fields used the "twisty knife" to unscrew the screws because both had white paint on them.  *Id.*, PageID 5908–09.  The prosecution also offered testimony from Burton's relatives—who corroborated her story that she had visited them around 1:45 a.m. worried that Fields might have killed his brother.

The defense responded with three main reasons why Fields did not commit the crime. Reason One: The defense asserted that a "very intoxicated" Fields could not have walked to

Horton's home, unscrewed many screws with the twisty knife, and murdered her in the 35 or so minutes between when he left Burton's apartment (around 1:55 a.m.) and when the officers found him (around 2:30 a.m.). *Id.*, PageID 5923. The defense added that the knife did not "fit into the Phillips head" screws. *Id.* Reason Two: The defense relied on the blood evidence. Although Fields's blood and Horton's blood were both at the crime scene, Fields's blood was not found on Horton and Horton's blood was not found on Fields. According to the defense, "it is more likely than not that the person who did this had some blood on them." *Id.*, PageID 5917. Reason Three: The defense argued that Burton had a motive to kill Horton because Horton was evicting her. And while Burton denied the claims, some witnesses said that she had solicited them to rob Horton. The defense also noted that Burton was "unaccounted for" between when she left Fields's apartment and when she showed up at a relative's house—a gap in time that could have lasted almost two hours. *Id.*, PageID 5918, 5924.

Fields's arguments failed to convince his second jury. It too convicted him of both counts and sentenced him to death. *Fields v. Commonwealth*, 274 S.W.3d 375, 391 (Ky. 2008). Fields again appealed. This time, the Kentucky Supreme Court affirmed. *Id.* at 420.

Fields next pursued postconviction relief in state court. *Fields v. Commonwealth*, 2014 WL 7688714, at *1 (Ky. Dec. 18, 2014) (per curiam). After holding a hearing, the trial court rejected Fields's arguments. *Id.* at *2. The Kentucky Supreme Court again affirmed. *Id.* at *15.

Having exhausted all state avenues for relief, Fields turned to federal court. He filed a habeas petition asserting 30 claims for relief under 28 U.S.C. § 2254. Then-District Judge Amul Thapar denied relief in a comprehensive opinion. *Fields v. White*, 2016 WL 3574396, at *8–54 (E.D. Ky. June 23, 2016).

Our court and the district court granted Fields a certificate of appealability on five claims. *See Fields v. Jordan*, 54 F.4th 871, 876 (6th Cir. 2022). On appeal, Fields first argued that his jury had conducted an unconstitutional "experiment" during deliberations. He next argued that his trial lawyers had provided ineffective assistance in three ways: by failing to interview a witness who saw him in the hours before the murder; by failing to introduce expert testimony on his intoxicated state; and by failing to present mitigating evidence at the penalty phase. Lastly,

Fields argued that the trial court should have allowed him to introduce evidence at the penalty phase showing the low likelihood that he would ever get released if sentenced to life imprisonment. *See id.*

A panel of our court granted Fields relief on the jury-experiment claim. *Id.* at 877–82. Judge Batchelder dissented. *Id.* at 883–84. We voted to rehear this case en banc, *Fields v. Jordan*, 60 F.4th 1023, 1024 (6th Cir. 2023) (en banc), and now consider these five claims in turn.

## II. Jury-Experiment Claim

Fields primarily argues that his jury violated the Constitution by experimenting with the "twisty knife" during deliberations in the jury room. Because the Kentucky Supreme Court rejected this claim on the merits, Fields may obtain relief only if he meets AEDPA's standards. But he has failed to identify any "clearly established" Supreme Court precedent in this jury-experiment context that could permit relief under AEDPA. 28 U.S.C. § 2254(d)(1).

## A. Background

The state trial court allowed the jurors to possess various pieces of evidence, including the twisty knife, in the jury room during their deliberations. *See Fields*, 2014 WL 7688714, at *3. Fields had no objection to this approach. During opening statements, one of his lawyers told the jury: "You will get to hold this knife, and feel this knife and look at this knife[.]" Opening Tr., R.30-13, PageID 5923. As part of his post-conviction motion, however, Fields provided the affidavits of two jurors who revealed that the jury had conducted an "experiment" with the knife. The jury tried "using the knife to unscrew screws that were part of a wall of cabinets in the jury room." Aff., R.33-1, PageID 8928. "The knife easily unscrewed the screws." *Id.*

Fields called these two jurors to testify at his post-conviction hearing. The prosecution objected that Fields could not introduce this evidence under Kentucky Rule of Criminal Procedure 10.04. That rule provides: "A juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot." Ky. R. Crim. P. 10.04. The trial court "sustained" this objection. Tr., R.89-3, PageID 13510.

The court nevertheless allowed Fields to proffer the jurors' testimony. One of the jurors testified that the jury experiment "was probably [her] fault." *Id.*, PageID 13521. During deliberations, she pondered whether Fields could have unscrewed the screws on Horton's window using the knife. Someone responded that it "wouldn't be that hard." *Id.* Another juror then used the knife to take screws out of a jury-room cabinet door. It "didn't take long" to remove the screws. *Id.*, PageID 13523. The testifying juror recalled that the experiment occurred at the penalty phase while the jury debated whether to sentence Fields to death. She did not view the experiment as about Fields's guilt or innocence, but it did give her peace of mind because "a man's life [hung] in the balance[.]" *Id.*, PageID 13522. Fields's counsel attempted to impeach this juror with a statement from her affidavit (which someone in counsel's office had drafted) suggesting that the experiment had occurred at the guilt phase. But she stood firm, noting that she was "almost sure" it had happened at the penalty phase. *Id.*, PageID 13526.

The other testifying juror agreed that one of the others had unscrewed a jury-room cabinet with the twisty knife. She opined that the jury engaged in this activity "just to see if you could do it." *Id.*, PageID 13516. Unlike the other testifying juror, she recalled that the experiment occurred during the guilt phase.

In his post-conviction motion, Fields argued that this experiment violated his rights to confront witnesses, to due process, and to a fair trial. Rejecting this claim after the hearing, the trial court reiterated that it had "sustained" the "objection to juror testimony on this issue" under Kentucky law. Op., R.33-2, PageID 9503. Regardless, the court held that the experiment did not show any "juror misconduct" that violated the Constitution. *Id.*

The Kentucky Supreme Court affirmed. *Fields*, 2014 WL 7688714, at *2–4. Unlike the trial court, it chose to "assume" that Kentucky's procedural rules allowed the jurors to testify about the experiment. *Id.* at *3. Even so, the court held that the experiment did not violate the Constitution. It interpreted various circuit decisions to hold that jurors may "use their own senses, observations, and experiences to conduct an experiment or reenactment with already admitted evidence." *Id.* at *4. Applying this rule, it saw no error in the experiment in Fields's case. *Id.*

B. Merits

1. The Kentucky Supreme Court's decision triggers AEDPA. As relevant here, that law bars a federal court from granting habeas relief to a state prisoner on a "claim that was adjudicated on the merits in State court" unless the state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). The Supreme Court has regularly "reminded" courts that this text adopts a "difficult to meet" test. *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)).

State prisoners must show two basic things. *See Bergman v. Howard*, 54 F.4th 950, 957 (6th Cir. 2022). *First*, they must identify a "clearly established" principle of "Federal law" that the "Supreme Court" has pronounced. 28 U.S.C. § 2254(d)(1). This language allows prisoners to seek relief based on just one source: "Supreme Court" decisions. *Id.* Even more narrowly, prisoners must rely on the "holdings" of those decisions; the Court's "dicta" does not clearly establish binding law. *Woodall*, 572 U.S. at 419 (citation omitted). By requiring federal courts to identify a Supreme Court holding to grant relief, AEDPA bars us from grounding that relief in other sources, such as our own decisions. *See Kernan v. Cuero*, 583 U.S. 1, 8 (2017) (per curiam). Prisoners thus may not make up for the lack of an on-point Supreme Court decision in a specific context by claiming that the circuit courts have all extended the Court's general principles to that context. *See Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam). Conversely, disagreement in the lower courts on how the Court's general principles apply in the relevant area will show the absence of clearly established law. *See Carey v. Musladin*, 549 U.S. 70, 76–77 (2006).

Likewise, prisoners may not sidestep the lack of Supreme Court precedent on a legal issue by raising the "level of generality" at which they describe the Court's holdings on other issues. *See Woods v. Donald*, 575 U.S. 312, 318 (2015) (per curiam); *Lopez v. Smith*, 574 U.S. 1, 6 (2014) (per curiam); *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam). So, for example, a decision that the Confrontation Clause limits a court's ability to restrict a defendant's *cross-examination* of a witness does not count as "clearly established" law on the distinct question whether the court may restrict the defendant's use of *extrinsic evidence* to impeach the

witness. *See Stewart v. Winn*, 967 F.3d 534, 537 (6th Cir. 2020). And prisoners cannot argue that clearly established law exists on the extrinsic-evidence issue merely by reframing the Court's narrow "cross-examination holding" as a broad ruling about the "right to present 'evidence bearing on [a witness's] credibility.'" *Id.* (quoting *Jackson*, 569 U.S. at 512).

*Second*, once a prisoner has identified a clearly established Supreme Court holding with specificity, the prisoner must show that a state court's denial of relief was "contrary to" or an "unreasonable application" of this holding. 28 U.S.C. § 2254(d)(1); *Bergman*, 54 F.4th at 957. A state decision cannot be "contrary to" a Supreme Court holding unless it adopts a conflicting legal rule or reaches the opposite result in a case with materially identical facts. *See Lockyer v. Andrade*, 538 U.S. 63, 73 (2003). And a state decision cannot be an "unreasonable application" of that holding unless it commits "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). A federal court thus may not grant relief simply because it believes that the state court reached a mistaken (or even clearly erroneous) result. *See Shinn v. Kayer*, 141 S. Ct. 517, 523–24 (2020) (per curiam). Rather, it may grant relief only for those rare state-court decisions that count as "extreme malfunctions in the state criminal justice systems[.]" *Donald*, 575 U.S. at 316 (quoting *Richter*, 562 U.S. at 102).

2. Fields has shown no extreme malfunction here. He argues that the jury violated the Constitution by examining evidence that the prosecution admitted at trial (the twisty knife) using jury-room items that it did not admit (the cabinet and its screws). But he has failed to get past AEDPA's first step by identifying "clearly established" law on this topic. 28 U.S.C. § 2254(d)(1). Fields cites not a single Supreme Court case that has ever "addressed" the propriety of jurors experimenting with evidence during deliberations—let alone one that has found these experiments unconstitutional. *Donald*, 575 U.S. at 317. This lack of precedent makes it difficult for Fields even to pinpoint the *specific constitutional right* that the experiment implicates. His briefing interchangeably suggests that the experiment violated his Sixth Amendment right to confrontation, his Sixth Amendment right to a jury trial, or his Fourteenth Amendment right to due process. Because the Court has never considered jury experiments,

however, we are left to guess how it would distinguish lawful experiments from unlawful ones under any of these constitutional guarantees.

First consider the Court's precedent on the Confrontation Clause. The clause gives defendants the right "to be confronted with the witnesses against" them. U.S. Const. amend. VI. For present purposes, the key word in this text is "witnesses." This word clarifies that courts must permit a defendant to have a "face-to-face meeting" with certain individuals. *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988). More specifically, it covers individuals who "bear testimony"— that is, those who make a "solemn declaration or affirmation . . . for the purpose of establishing or proving some fact." *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (quoting 2 Noah Webster, *An American Dictionary of the English Language* (1828)). Fields, for example, supports his claim with a decision about a bailiff's out-of-court statements. *See Parker v. Gladden*, 385 U.S. 363, 363–65 (1966) (per curiam). The bailiff in *Parker* privately told jurors that the "wicked" defendant was guilty and that the Supreme Court would fix any errors in a guilty verdict. *Id.* at 363–64. The Court held that these comments violated the Confrontation Clause. *Id.* at 364–65. It treated the bailiff as a "witness" who made testimonial statements that the defendant could not confront. *See id.*

But Fields does not tell us how these precedents interpreting the Confrontation Clause would apply to the jury experiment in his case—let alone show that they "clearly" control. 28 U.S.C. § 2254(d)(1). Unlike in *Parker*, Fields's counsel conceded that his claim does not involve out-of-court statements by "witnesses." Oral Arg. 12:09–:11. Instead, he complains that the jury used unadmitted tangible objects (a cabinet and screws) to test the twisty knife. But no Supreme Court decision has ever suggested that the Confrontation Clause applies to physical evidence. And many lower courts have held that the clause does not reach this type of nontestimonial evidence. *See United States v. Miller*, 982 F.3d 412, 437 (6th Cir. 2020); *see also State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). Indeed, "how could one cross-examine [a cabinet]?" *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008). At the least, *Parker*'s "holding" that the bailiff's statements violated the Confrontation Clause—"the only aspect of the decision relevant here"—does not clearly apply to the physical items in this case. *Woodall*, 572 U.S. at 424.

Next consider the Court's precedent on the Sixth Amendment "right" to a "trial, by an impartial jury." U.S. Const. amend. VI. The Constitution does not further specify the protections that accompany this right. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020). To determine the right's "content," then, the Court has long relied on what a jury trial historically looked like, examining such sources as "the common law, state practices in the founding era, or opinions and treatises written soon afterward[.]" *Id.* As one example, the Court invoked these sources to hold that the jury-trial right requires jurors to reach unanimous verdicts. *See id.* at 1395–97. As another example, the Court invoked these sources to hold that the jury-trial right requires a jury to find any fact that increases the defendant's punishment above the statutory maximum that would otherwise apply without that fact. *See Apprendi v. New Jersey*, 530 U.S. 466, 476–83 (2000).

Fields supports his claim with two decisions holding that this general jury-trial right also includes a specific guarantee against juror bias. *See Irvin v. Dowd*, 366 U.S. 717, 721–28 (1961); *Turner v. Louisiana*, 379 U.S. 466, 471–74 (1965). The defendant in *Irvin* was charged with committing six murders near a small town. 366 U.S. at 719. The local media extensively publicized his crimes. *Id.* at 720, 725. This publicity made it impossible to find unbiased jurors, and eight of the twelve people who sat on the defendant's jury had decided that he was guilty before hearing any evidence. *Id.* at 727–28. The Court held that these biased jurors violated the defendant's right to an "impartial" jury. *See id.* at 721–28. It reasoned that the jury-trial right required "a panel of impartial, 'indifferent' jurors" who will base their verdict on the "evidence developed at the trial" rather than a preconceived opinion about the defendant's guilt. *Id.* at 722 (citing *Reynolds v. United States*, 98 U.S. 145, 155 (1879)). This aspect of the right has deep roots: "In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.'" *Id.* (quoting 1 Edward Coke, *Institutes of the Laws of England* 155b (1628)).

The Court extended *Irvin* in *Turner*. There, the prosecution relied on the testimony of two deputy sheriffs as its main evidence in the defendant's murder trial. 379 U.S. at 467. The trial court had sequestered the jurors and placed them in the sheriff's care. *Id.* at 467–68. So the testifying deputies had a "close and continual association with the jurors," eating meals with them and mingling with them throughout the trial. *Id.* at 468. The Court held that the jury's

association with key prosecution witnesses violated the jury-trial guarantee. *Id.* at 471–74. Although the deputies had not talked with the jurors about the case, their credibility was critical. *Id.* So their "intimate association" with the jury—in which they "renew[ed] old friendships and [made] new acquaintances"—effectively biased the jurors in favor of prosecution witnesses. *Id.* at 473–74.

For a second time, however, Fields does not explain why these decisions about the Sixth Amendment right against jury *bias* "clearly" apply to the jury *experiment* in his case. 28 U.S.C. § 2254(d)(1); *see Jackson*, 569 U.S. at 511–12. As a specific matter, Fields does not argue that his jurors were "biased" against him. He, for instance, does not claim that his jurors had "formed an opinion" about his guilt before trial—like the jurors in *Irvin*. 366 U.S. at 722 (quoting *Reynolds*, 98 U.S. at 155). Nor does he claim that they had an "intimate association" with prosecution witnesses—like the jurors in *Turner*. 379 U.S. at 473. Indeed, we fail to see how Fields's jury-experiment claim even implicates the specific jury-trial requirement that *Irvin* and *Turner* enforced: the requirement of an "impartial" jury. U.S. Const. amend. VI.

As a general matter, the Supreme Court's other jury-trial decisions would instruct us to examine the "historical foundation" for Fields's claim that a jury may not test admitted evidence using unadmitted jury-room objects. *Apprendi*, 530 U.S. at 477. If, say, the "common law" or "state practices in the founding era" barred this type of jury-room experiment, perhaps the jury-trial right would incorporate that rule (as it has incorporated the jury-unanimity rule). *Ramos*, 140 S. Ct. at 1395. But Fields does not identify any common-law authorities, treatises, or other sources to help answer this question. That is for good reason. If Fields must build his claim's legal foundations from the ground up in this fashion, he could not possibly show that the Supreme Court has *already* "clearly established" that the jury experiment violated the jury-trial right. 28 U.S.C. § 2254(d)(1). Just as our own precedents cannot qualify as "clearly established" law, neither can "state-court decisions, treatises, or law review articles." *Cuero*, 583 U.S. at 8.

Lastly, consider the Court's precedent on the Due Process Clause. That clause prohibits a State from "depriv[ing]" defendants of their "life" or "liberty" "without due process of law[.]" U.S. Const. amend. XIV, § 1. The Supreme Court has long held that this general text has

"limited operation" in criminal contexts because of the many other guarantees that the Bill of Rights gives to criminal defendants. *Medina v. California*, 505 U.S. 437, 443 (1992) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). If these express protections do not apply, due process bars only those practices that "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 445 (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)). And, as Justice Kagan has explained, the Court again looks to "historical practice" to identify these "fundamental" principles. *Kahler v. Kansas*, 140 S. Ct. 1021, 1027 (2020) (citations omitted). When, for example, the Court held that due process required the prosecution to prove its case beyond a reasonable doubt, it noted that this specific standard "date[d] at least from our early years as a Nation." *In re Winship*, 397 U.S. 358, 361 (1970); *see also Perry v. New Hampshire*, 565 U.S. 228, 237 (2012); *Deck v. Missouri*, 544 U.S. 622, 626 (2005).

For a third time, however, Fields fails to show that any of these due-process decisions "clearly" apply to the jury experiment in his case. 28 U.S.C. § 2254(d)(1). He identifies no specific due-process precedent on jury experiments. And the Court's generic due-process test (which examines our country's "fundamental" "principles") lacks the required specificity to "supply a ground for relief" under AEDPA. *Brown v. Davenport*, 596 U.S. 118, 136 (2022); *see Stewart*, 967 F.3d at 539–40. Again, perhaps there is a traditional "common law" principle that would bar jury experiments like the one in this case. *See Deck*, 544 U.S. at 626. But Fields correctly makes no effort to identify that principle in these AEDPA proceedings.

In sum, we need not take a position on how these three constitutional rights should apply to Fields's jury-experiment claim in this case. To resolve that claim, we need only say that "no Supreme Court precedent establishes that jury experiments violate" any of the rights. *Fields*, 54 F.4th at 883 (Batchelder, J., dissenting). AEDPA thus forecloses relief on the claim.

3. In response, Fields argues that *Irvin*, *Turner*, *Parker*, and one earlier decision clearly establish "a constitutional right to have the jury determine guilt or innocence based only on evidence presented at trial." Appellant's Suppl. Br. 1; *Parker*, 385 U.S. at 364–65; *Turner*, 379 U.S. at 472; *Irvin*, 366 U.S. at 722; *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). And because the prosecution did not offer the jury-room cabinet and screws into evidence, Fields's

argument goes, the Kentucky Supreme Court unreasonably applied this bright-line rule by allowing his jurors to use that "extrinsic evidence" during their deliberations. Appellant's Suppl. Br. 8–9.

This line of reasoning bears the hallmarks of circuit decisions the Supreme Court has seen fit to summarily reverse under AEDPA: Fields articulates a *broad rule* based on *narrow holdings* in order to "transform" an "imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'" *Jackson*, 569 U.S. at 512 (quoting 28 U.S.C. § 2254(d)(1)). His line of reasoning makes two mistakes.

To begin with, Fields wrongly treats as clearly established law a "general proposition" that originates with a few quotations from far-afield decisions. *Lopez*, 574 U.S. at 5–6. *Irvin*, for example, noted that a "verdict must be based upon the evidence developed at the trial." 366 U.S. at 722. Similarly, *Turner* stated that "[t]he requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." 379 U.S. at 472; *see Parker*, 385 U.S. at 364–65. But this principle that a defendant's guilt must rest on the evidence is just as "abstract" as others that the Court has held cannot serve as clearly established law—such as the principle that a defendant has the right to "adequate notice of the charges," *Lopez*, 574 U.S. at 5–6, or "to present 'evidence bearing on [a witness's] credibility,'" *Jackson*, 569 U.S. at 512 (citation omitted).

Next, by framing *Parker*, *Turner*, *Irvin*, and *Patterson* at a sky "high level of generality," Fields overlooks what matters: their holdings. *Lopez*, 574 U.S. at 6 (citation omitted); *see Woodall*, 572 U.S. at 419. None of these cases "addresses, even remotely, the specific question presented by this case." *Lopez*, 574 U.S. at 6. As we have explained, the holdings in *Parker*, *Irvin*, and *Turner*—that the Confrontation Clause bars a bailiff from telling jurors that the defendant is guilty, *Parker*, 385 U.S. at 364–65; that the jury-trial right bars individuals from sitting on a jury if they have already decided that the defendant is guilty, *Irvin*, 366 U.S. at 721–28, and that this right bars jurors from intimately associating with prosecution witnesses, *Turner*, 379 U.S. at 471–74—say nothing about whether jurors may "test" an admitted exhibit using objects in the jury room.

*Patterson* also had nothing to do with jury experiments—or even the constitutional rights that Fields invokes. Fields quotes this sentence from that decision: "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." 205 U.S. at 462. But the Court was addressing a *free-speech* challenge to a state court's decision to hold a publisher in contempt for articles that ridiculed the court's earlier rulings. *Id.* at 458–59. The Supreme Court rejected this speech claim, opining that the First Amendment might protect only against prior restraints. *Id.* at 462–63. We very much doubt that *Patterson* sets forth the free-speech rules that govern today. *Cf. Garrison v. Louisiana*, 379 U.S. 64 (1964). Regardless, an opinion about a right to speak under the First Amendment contains only irrelevant "dicta" on whether a jury experiment violates the Sixth or Fourteenth Amendment. *Donald*, 575 U.S. at 316 (citation omitted).

To be sure, the notion that a jury's verdict must rest on "the evidence developed at the trial" may well go back centuries. *Turner*, 379 U.S. at 472. Blackstone, for example, suggested that it would "vitiate the verdict" if jurors "speak with either of the parties or their agents, after they are gone from the bar; *or if they receive any fresh evidence in private*[.]" 3 William Blackstone *Commentaries on the Laws of England* 376 (1768) (emphasis added); *see also* James B. Thayer, *The Jury and Its Development*, 5 Harv. L. Rev. 295, 311 (1892); 2 Matthew Hale & Charles Runnington, *The History of the Common Law* 147–48 (5th ed. 1794). But, as then-District Judge Thapar explained, this general idea does little to help answer the specific question that matters here: Do jurors "decide guilt based on something other than 'the evidence presented' when they conduct an experiment using the evidence presented"? *Fields*, 2016 WL 3574396, at *9. Stated differently, when does a jury experiment change from a (valid) "examination of proper evidence" into a (perhaps impermissible) "production of new evidence"? Caroll J. Miller, Annotation, *Propriety of Juror's Tests or Experiments in Jury Room*, 31 A.L.R.4th 566, § 2[a], Westlaw (database updated 2023). The line between the two has been "difficult to draw," so lower courts have developed "few, if any, general rules" to guide the inquiry. *Id.*

Indeed, the wide divergence that has existed on this issue for over a century (whether as a matter of state or federal law) confirms that the Supreme Court has not adopted a clear federal

rule to cover the field. *Carey*, 549 U.S. at 76–77. *Compare Taylor v. Commonwealth*, 17 S.E. 812, 815–16 (Va. 1893), *with Forehand v. State*, 11 S.W. 766, 766 (Ark. 1889) (per curiam). On the one hand, in addition to the Kentucky Supreme Court's decision here, many cases conflict with Fields's proposed legal rule that jurors may not experiment with admitted exhibits using "extrinsic evidence" from the jury room. Take *Fletcher v. McKee*, 355 F. App'x 935 (6th Cir. 2009). There, the prosecution charged the defendant with murdering his pregnant wife, Leann. *Id.* at 936. The defense claimed that Leann accidentally shot herself. *Id.* The jurors experimented with the gun during deliberations. *Id.* While holding the gun, a juror fell off a jury-room table in the way that the defense hypothesized Leann had fallen off her bed after she shot herself. *Id.* Other jurors then examined where the gun landed. *Id.* The jury convicted the defendant partly because the experiment's results did not match the defense's theory. *Id.* In this AEDPA context, we held that the experiment did not produce "extrinsic evidence" that might create a constitutional problem. *Id.* at 940.

*Fletcher* is on all fours with Fields's case. Both involved a mix of admitted evidence (the gun or twisty knife) and unadmitted objects (the jury-room table or cabinet). And many of Fields's criticisms of the jury experiment here would apply just as well to the experiment there. Fields notes that the jury-room conditions were far different from those at night outside Bess Horton's home. The cabinet had universal screws, not Phillips screws. The jury room was light, not dark. And the juror who conducted the experiment was sober, not intoxicated. Yet one could have made similar critiques in *Fletcher*. Was the jury-room table the same height as the bed? Was the juror the same size as Leann? Did the juror fall with the same force as Leann would have fallen after being shot? The generic principle from *Parker* or *Turner* that jurors should rely only on the trial evidence does not "clearly establish" a specific legal rule that would allow us to find the experiment in *Fletcher* proper but the experiment in this case improper.

Countless other cases have likewise found no federal or state error when jurors conducted experiments using "extrinsic evidence" from the jury room. Courts, for example, have rejected challenges to jury experiments with a "personal pocket knife" or "cardboard knife" to reenact a fight. *United States v. Abeyta*, 27 F.3d 470, 477 (10th Cir. 1994) (White, Senior Associate J.); *Kurina v. Thieret*, 853 F.2d 1409, 1413 (7th Cir. 1988); *People v. Kurena*, 410 N.E.2d 277, 282

(Ill. Ct. App. 1980); *cf. State v. Balisok*, 866 P.2d 631, 632–34 (Wash. 1994). They have similarly rejected challenges to: an experiment in which a juror covered his head and wore sunglasses to see if other jurors could recognize him, *United States v. Hephner*, 410 F.2d 930, 936 (7th Cir. 1969); an experiment in which jurors hit a jury-room "leather chair" with an admitted "wooden rod," *Mitchell v. State*, 726 N.E.2d 1228, 1233, 1237 (Ind. 2000), *abrogated on other grounds by Bealtie v. State*, 924 N.E.2d 643 (Ind. 2010); and an experiment in which jurors estimated a bullet's trajectory using a string from a juror's jacket and a jury-room protractor, *People v. Collins*, 232 P.3d 32, 89–91 (Cal. 2010). Courts have also rejected challenges to experiments in which jurors pricked or inked their fingers (to see how long it takes for blood to clot or to confirm that their fingerprints differed from the fingerprints in evidence). *See State v. Graham*, 422 So. 2d 123, 132–33 (La. 1982); *State v. Jackson*, 596 N.W.2d 262, 266 (Minn. Ct. App. 1999). None of these decisions comports with Fields's purported "clearly established" legal rule that jurors categorically may not use jury-room objects to conduct experiments.

On the other hand, Fields does identify some decisions that may support his rule (at least as a matter of state law). He, for instance, highlights the Kentucky Supreme Court's decision in *Smith v. Commonwealth*, 645 S.W.2d 707 (Ky. 1983). There, the prosecution alleged that the defendant's belt buckle had left a mark on a plasterboard wall. *Id.* at 709. After the jury was given a piece of the wall that had not been admitted into evidence, jurors conducted experiments on it using the belt buckle. *Id.* at 710. The court reversed based on the principle that the jury may consider only the trial evidence. *Id.* Similarly, another state court reversed a conviction based on an experiment in which a juror put on the defendant's pants (which had been admitted into evidence) and bound his hands with a rope (which had not been) to see if the defendant could remove drugs from his pocket while handcuffed. *Ex Parte Thomas*, 666 So. 2d 855, 857–58 (Ala. 1995); *see also, e.g.*, *State v. Sanders*, 68 Mo. 202, 206 (1878). But these lower-court decisions do Fields no good in this AEDPA context. *See Cuero*, 583 U.S. at 8. At best, they confirm the tension in the caselaw on this topic—tension that shows the *absence* of clearly established law. *See Carey*, 549 U.S. at 76–77. That fact forecloses relief for Fields under AEDPA.

Fields lastly argues that our court has already held that his rule qualifies as "clearly established" law under AEDPA. *See Doan v. Brigano*, 237 F.3d 722, 733 & n.7 (6th Cir. 2001). He is correct that, although circuit decisions cannot create clearly established law, circuit courts must follow their own decisions holding that the Supreme Court has clearly established a principle for AEDPA purposes. *See Rodgers*, 569 U.S. at 64. And he is correct that our court in *Doan* held that the Supreme Court in *Parker* and *Turner* had clearly established the general rule that a "defendant be afforded the right to confront the evidence and the witnesses against him, and the right to a jury that considers only the evidence presented at trial." *Doan*, 237 F.3d at 733 n.7; *see Moore v. Mitchell*, 708 F.3d 760, 805–06 (6th Cir. 2013); *Fletcher*, 355 F. App'x at 937. But we issued *Doan* only five years after AEDPA. At that time, the Supreme Court had yet to interpret the phrase "clearly established" law to exclude "abstract" principles, *Lopez*, 574 U.S. at 6, or rules "that speak only at a high level of generality," *Davenport*, 596 U.S. at 136. *Doan* conflicts with this recent guidance. So we now reject *Doan*'s holding for the reason Judge Batchelder suggested at the panel stage: "that the Supreme Court has abrogated *Doan* and that we are no longer bound to follow it." *Fields*, 54 F.4th at 884 (Batchelder, J., dissenting). Because the Supreme Court has issued no guidance on jury experiments like the one here, it lacks "clearly established" law on the topic.

One final point. All the evidence about the jury's experiment in this case came from the jurors themselves. And the state trial court seemingly denied Fields's claim on the alternative ground that a Kentucky procedural rule barred jurors from testifying about their deliberations. Ky. R. Crim. P. 10.04. This type of "no-impeachment rule" has a long history. "At common law jurors were forbidden to impeach their verdict, either by affidavit or live testimony." *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 215 (2017). The Court has adopted a constitutional exception to the no-impeachment rule when jurors exhibit racial animus. *See id.* at 225. And many federal and state legislators or rule-makers have made other exceptions to the rule, including when jurors use "extraneous" or "outside" evidence. *Id.* at 215–17. Did the Constitution also require an exception to the no-impeachment rule in Fields's case and thus render the trial court's alternative ruling invalid? We merely flag this (unbriefed) question to clarify that we have not impliedly resolved it by considering the jurors' testimony about the

experiment. We may save the issue for another day given our holding that Fields cannot meet AEDPA's standards even accepting that testimony.

### III. Ineffective-Assistance Claims

In three ways, Fields next argues, his attorneys made such grave mistakes during his trial that they deprived him of his Sixth Amendment right to counsel. Yet the Kentucky Supreme Court resolved these three ineffective-assistance claims on their merits too, so AEDPA's standards again apply. And Fields has not shown that the state court engaged in an "unreasonable application" of the Supreme Court's test for evaluating his counsel's performance, 28 U.S.C. § 2254(d)(1), or made an "unreasonable determination of the facts" about their conduct, *id.* § 2254(d)(2).

### A. Ineffective Assistance in the AEDPA Context

AEDPA has "special importance" when defendants allege that their counsel performed ineffectively. *Kayer*, 141 S. Ct. at 523. The combination of the Supreme Court's normally demanding test for ineffective-assistance claims with its even more demanding test for AEDPA relief creates a "doubly deferential" review framework for federal courts. *Roger v. Mays*, 69 F.4th 381, 389 (6th Cir. 2023) (en banc). We presume the reasonableness of both the strategic decisions of Fields's attorneys and the Kentucky Supreme Court's holding that these attorneys performed adequately. *See Dunn v. Reeves*, 141 S. Ct. 2405, 2410–11 (2021) (per curiam).

Even outside the AEDPA context, a defendant like Fields faces a tall task to prove that his lawyers performed so incompetently that they deprived him of his Sixth Amendment right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *Richter*, 562 U.S. at 105. Since *Strickland v. Washington*, 466 U.S. 668 (1984), this claim has required a defendant to prove two elements. *Id.* at 687. The defendant's attorneys must have performed incompetently. *Id.* And their deficient performance must have prejudiced the defendant's chances at trial. *Id.*

Only the first element matters in Fields's case. This element requires him to prove that his lawyers made objectively unreasonable decisions when considered under all of the circumstances. *See id.* at 687–88. Fields cannot meet this test simply by showing that the

lawyers' decisions "deviated" from the "best" or "common" course. *Richter*, 562 U.S. at 105. Rather, their decisions must have reached such a level of "incompetence" that we can say that Fields lacked the "'counsel' guaranteed [him] by the Sixth Amendment." *Id.* at 104–05 (quoting *Strickland*, 466 U.S. at 687). And when deciding whether Fields's counsel performed incompetently, we start with a "strong presumption" that their performance fell "within the wide range" of adequate representation. *Strickland*, 466 U.S. at 689. We also undertake a "highly deferential" review of their decisions, avoiding the unfair "hindsight" bias that often infects after-the-fact assessments. *Id.*

This "high bar" reaches even higher levels when, as in Fields's case, a state court triggers AEDPA by rejecting a defendant's claim that counsel provided ineffective assistance. *Richter*, 562 U.S. at 105 (citation omitted). At this point, it is no longer enough for Fields to show that his attorneys made a decision that no reasonable lawyer would have made. He now must show that "*every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision." *Reeves*, 141 S. Ct. at 2411 (quoting *Richter*, 562 U.S. at 101). And *Strickland*'s "general" standard for evaluating counsel's performance increases the burdens on Fields further still. *Davis v. Carpenter*, 798 F.3d 468, 473 (6th Cir. 2015). Under AEDPA, "the more general the rule, the more leeway state courts have" when applying the rule to a defendant's specific facts. *Kayer*, 141 S. Ct. at 523 (quoting *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560–61 (2018) (per curiam)). So the Kentucky Supreme Court has even more "latitude" to reject Fields's ineffective-assistance claims without our second guessing its decision as an "unreasonable application" of *Strickland*'s performance prong. *See id.* (citation omitted); 28 U.S.C. § 2254(d)(1).

To the extent that Fields also challenges the state trial court's factual findings about his counsel's conduct (apart from the Kentucky Supreme Court's legal conclusion about their performance), AEDPA requires him to meet another demanding test. He must show that the trial court made "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). To meet this test, Fields must do more than convince us that we would have reached a different conclusion in the first instance. *See Burt v. Titlow*, 571 U.S. 12, 18 (2013). He instead must show not just that the state court's

determination was debatable or incorrect, but also that it was unreasonable—"a substantially higher threshold" for obtaining relief. *Shoop v. Twyford*, 142 S. Ct. 2037, 2043 (2022) (citation omitted); *see Burt*, 571 U.S. at 18; *Wood v. Allen*, 558 U.S. 290, 301–03 (2010).

Fields says he can meet these rigorous legal and factual standards for three different reasons. He is wrong on all three fronts.

## B. Testimony of James Berry

1. Fields first asserts that his trial attorneys performed incompetently by failing to interview and introduce the testimony of a witness who saw him on the evening before the murder. The trial evidence showed that, while driving around with their friends that evening, Fields and Burton stopped at the home of Phyllis Berry's brother—a man named James Berry (whom we will refer to as "Berry" from this point). At Fields's post-conviction hearing, Berry testified that Fields was already drunk when the group reached his house. Fields was "staggering" and speaking incoherently. J. Berry Tr., R.89-4, PageID 13703. Berry also watched Fields take "some kind of pills." *Id.*, PageID 13702. Berry's sister allegedly told him later that Fields had ingested "horse tranquilizers" (the street name for PCP) and that this drug explained Fields's hallucinations. *Id.*, PageID 13710.

In his postconviction motion, Fields argued that his lawyers performed deficiently by failing to interview Berry and offer his testimony at trial. *Fields*, 2014 WL 7688714, at *8. According to Fields, Berry's testimony about his extreme intoxication would have helped prove two defenses: that he could not have removed 17 screws from Horton's window late at night or, at the least, that he could not have formed the mental state required for murder. *Id.*

The Kentucky Supreme Court affirmed the state trial court's rejection of this claim. *Id.* at *8–9. It initially held that the trial court's findings of historical fact "were not clearly erroneous." *Id.* at *9. The trial court had found that Fields's lawyers "conducted an extensive pre-trial investigation." Op., R.33-2, PageID 9498. They knew of Berry's "existence" and "evaluated whether he had any valuable testimony to present." *Id.* But counsel decided that Berry should not testify. *Id.* Fields vigorously asserted his innocence and did not want counsel to put on an "intoxication defense at trial." *Id.* And his lawyers believed that Berry would have

been a "problematic witness" because he was "a convicted felon with a history of psychiatric issues and drug abuse." *Id.*, PageID 9498, 9505. They also believed that Berry's testimony would have merely duplicated what other individuals at his house party had to say. *Id.*, PageID 9505. Based on these factual findings, the Kentucky Supreme Court held that counsel reasonably decided not to interview Berry both because his testimony would have been cumulative and because he would not have been a compelling witness. *Fields*, 2014 WL 7688714, at *8–9.

2. This decision did not unreasonably apply *Strickland*'s performance prong. Admittedly, there is no legal dispute that Fields's counsel had a "duty to investigate" Fields's case. *Strickland*, 466 U.S. at 690. There is also no factual dispute that Fields's counsel did not interview Berry. So the Kentucky Supreme Court needed to ask whether counsel made "a reasonable decision" that this interview was "unnecessary" under "all the circumstances"— giving "a heavy measure of deference to counsel's" investigative choices. *Id.* at 691.

Fields's claim fails under AEDPA because a "fairminded jurist" could conclude that a reasonable lawyer could have chosen not to interview Berry or put him on the stand. *Kayer*, 141 S. Ct. at 524. From a bird's eye view, when reviewing "all the circumstances" of counsel's decision, *Strickland*, 466 U.S. at 691, we must consider the other steps that counsel took to prepare for trial. Fields does not challenge the trial court's finding that his lawyers extensively investigated his case before trial. And there are only so many hours in the day. So it is generally for lawyers, not courts, to decide how best to "balance" their "limited resources" against the many potential investigative paths to follow. *Richter*, 562 U.S. at 107.

From a ground-level view, a "fairminded jurist" could hold that Fields's counsel reasonably chose not to interview Berry for the two reasons that the Kentucky Supreme Court identified. *Kayer*, 141 S. Ct. at 524. For one thing, the state court could properly decide that lawyers can refrain from interviewing a witness who has information that could "reasonably be expected to be only cumulative" of other testimony. *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam); *Fitchett v. Perry*, 644 F. App'x 485, 491–92 (6th Cir. 2016). And here, Berry's information was largely cumulative. Several others testified that Fields consumed alcohol for most of the day and was drunk on the evening of the murder. Berry's sister Phyllis described

Fields's drinking and opined that he was "intoxicated" when she dropped him off at his apartment. Berry Tr., R.30-17, PageID 6577–79, 6584, 6591–95. Another witness who drove around with Fields referred to him as "intoxicated" when the two parted ways, adding that Fields took "the rest of the beer with him." Trent Tr., R30-18, PageID 6646. Fields's brother likewise said that he was "drunk" back at their apartment. J. Fields Tr., R.30-19, PageID 6832. And Burton presumed that Fields started acting strangely at this location because he was "high" or "drunk." Burton Tr., R.30-18, PageID 6685.

For another thing, Fields identifies no Supreme Court precedent that would have barred the Kentucky Supreme Court from concluding that counsel could reasonably prioritize other witnesses over Berry in light of his credibility issues. Counsel knew that Berry was in "prison at the time" of trial. Lytle Tr., R.89-3, PageID 13548. Counsel also had never called a witness with the types of "psychological" issues that Berry suffered from. *Id.*, PageID 13565–66.

At best, Berry would have provided a firmer foundation that Fields was on PCP and not just drunk before the murder. Burton testified that Fields "pass[ed] a bowl of pills around" and referred to them as "horse tranquilizers" while at Berry's home, but she equivocated over whether she saw Fields take the pills. Burton Tr., 30-18, PageID 6753, 6755; Burton Tr., R.30-19, PageID 6802. Even on this factual issue, however, Fields overlooks that his counsel sought to elicit the PCP testimony for a narrow purpose. They sought to establish a "factual predicate" for a penalty-phase argument that the jury should not impose a death sentence because Fields had murdered Horton while under the influence of a hallucinogenic drug. *Fields*, 2014 WL 7688714, at *9. Burton's testimony accomplished that goal. And any greater emphasis on Fields's use of PCP could have harmed rather than helped his defense. *See Richter*, 562 U.S. at 108–09. After all, this drug could have caused "a psychotic episode" that would explain why Fields would "stab an elderly woman in the head" with such force that the knife came out the other side. *Fields*, 2014 WL 7688714, at *11. Laying the groundwork for the prosecutor to make this powerful point would have undercut Fields's innocence defense. *See id.*

Fields's responses do not change things. He argues that the Kentucky Supreme Court could not presume that his counsel made a strategic decision where, as here, they did not interview a "*known*" witness. Appellant's Br. 46. Fields derives this categorical rule—that

counsel must interview all known witnesses—from two decisions. *See Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005); *Workman v. Tate*, 957 F.2d 1339, 1345–46 (6th Cir. 1992). But AEDPA did not apply in these cases. *See Towns*, 395 F.3d at 257; *Workman*, 957 F.2d at 1344–46. So we cannot use them to "sharpen" *Strickland*'s general standard into the "specific legal rule" that he proposes. *Rodgers*, 569 U.S. at 64. Besides, neither decision adopts Fields's rule. We faulted counsel in both cases because they disregarded people who counsel should have reasonably known were "the only witnesses" with crucial information. *Workman*, 957 F.2d at 1345; *see Towns*, 395 F.3d at 253, 259. That is not true here—or at least the Kentucky Supreme Court reasonably could have so found.

Fields next claims that one of his attorneys conceded that she performed ineffectively when she noted that she "probably should have tracked" Berry down. Lytle Tr., R.89-3, PageID 13552. Not so. *Strickland*'s prohibition on evaluating counsel's choices in "the harsh light of hindsight" applies just as much to conscientious defense lawyers as to federal habeas courts. *Richter*, 562 U.S. at 107 (citation omitted). Even "experienced" lawyers often second-guess themselves when a jury finds their client guilty. *Id.* at 109. *Strickland*'s test thus considers their investigative steps from an "objective" perspective, not their "subjective" perspective. *Id.* at 110.

Fields lastly challenges the trial court's findings of fact. He argues that the trial court invented "*post hoc* rationalization[s]" for counsel's failure to investigate Berry and highlights evidence suggesting that counsel simply overlooked this witness. *Richter*, 562 U.S. at 109 (quoting *Wiggins v. Smith*, 539 U.S. 510, 526–27 (2003)). One of his attorneys testified, for example, that she was "praying" that Burton would mention his PCP use, a statement that conflicts with the claim that she reasonably decided that Berry's testimony would duplicate Burton's. Lytle Tr., R.89-3, PageID 13537. The evidence on which Fields relies may well create a dispute of fact over whether counsel acted strategically or negligently in failing to interview Berry.

But this argument ignores our standard of review. Fields must show that the state court's finding that counsel acted strategically was not just wrong but also "unreasonable." 28 U.S.C. § 2254(d)(2). And his evidence "does not suffice" to create such a one-sided record that every

reasonable adjudicator would have to find that counsel acted negligently. *Wood*, 558 U.S. at 301. As for evidence cutting the other way, Fields's counsel recalled Berry, knew that Berry was in prison, testified that she would have known of his mental-health problems at the time of trial, and remembered Berry's general (tangential) involvement. Lytle Tr., R.89-3, PageID 13548, 13552–53. Although counsel could not recall a specific strategic reason why she did not interview Berry, that omission did not compel the state court to find that no such reason existed. The omission is equally consistent with a finding that counsel merely could not recall the reason given the seven-year gap between the trial and post-conviction hearing. *Fields*, 2014 WL 7688714, at *9. How many lawyers will remember minute details of a lengthy trial from seven years in the past? And this time gap justifies the Supreme Court's "'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Richter*, 562 U.S. at 109 (citation omitted). The state courts reasonably applied that presumption here.

## C. Testimony of Dr. Robert Adams

1. Fields next argues that his attorneys wrongly failed to call an expert psychiatrist—Dr. Robert Adams—at the guilt phase. The post-conviction hearing revealed that one of Fields's attorneys had consulted with Adams "about the effects of PCP on an individual" and asked Adams to prepare a "PowerPoint presentation" summarizing these effects. Baker Tr., R.89-3, PageID 13588, 13590. According to counsel, Adams would have explained that PCP can cause "gruesome crime scenes" in which a "hallucinat[ing]" defendant acts violently while under a "psychotic break" from this drug. *Id.*, PageID 13590. But Fields's counsel decided not to use Dr. Adams at the guilt phase because his testimony could have harmed Fields's main defense that he did not murder Horton. *Id.*, PageID 13591–92. As counsel reasoned, "Dr. Adams' testimony would be consistent" with Fields's guilt by "explaining why someone would shove a knife through an elderly woman's head and cut her throat"—namely, because the person was "under some form of . . . drug-induced psychotic break." *Id.*, PageID 13622. And a "competent prosecutor" would have developed this theory if the defense chose to use Adams at the guilt phase. *Id.*, PageID 13654.

In his post-conviction motion, Fields nevertheless argued that his attorneys should have presented Dr. Adams at that phase for the same reasons they should have presented Berry. Testimony that Fields may have been in a PCP-induced hallucinogenic state could have weakened the prosecution's argument that Fields unscrewed Horton's window or shown that Fields lacked the mental capacity required for a murder conviction. *See Fields*, 2014 WL 7688714, at *11.

The Kentucky Supreme Court also rejected this ineffective-assistance claim. *Id.* The court reiterated that Fields's main defense was that "he was innocent," so Fields objected to counsel presenting any evidence that "made him appear guilty, including an intoxication defense." *Id.* And the court held that counsel reasonably decided not to call Adams because his testimony could have undercut this innocence defense. *Id.*

2. We can make short work of Fields's claim that the Kentucky Supreme Court's logic unreasonably applied *Strickland*. *Strickland* described a lawyer's "strategic choices" as "virtually unchallengeable" if the lawyer made them after a "thorough investigation of law and facts relevant to plausible options[.]" 466 U.S. at 690. A "fairminded jurist" could decide that this principle controls here. *Kayer*, 141 S. Ct. at 523. Fields's counsel ensured Dr. Adams's availability for "both" stages of trial, so the lawyers could have called him at the guilt phase if they "needed" him. Baker Tr., R.89-3, PageID 13591. But counsel decided that Adams's testimony would have made the jury "more likely" to "believe that [Fields] committed the offense" given its double-edged nature. *Id.*, PageID 13655; *see Carter v. Mitchell*, 443 F.3d 517, 532 (6th Cir. 2006). And as this type of informed "strategic choice[]" is "virtually unchallengeable" even on de novo review, *Strickland*, 466 U.S. at 690, it is certainly unchallengeable in proceedings subject to AEDPA.

Fields responds that his lawyers did not engage in a "thorough" enough "investigation" to trigger *Strickland*'s deferential rule for "strategic" decisions. *Id.* One of the attorneys noted, for example, that they "never seriously discussed interjecting the PCP into the guilt phase[.]" Baker Tr., R.89-3, PageID 13592. Yet this attorney spoke with Dr. Adams before trial. The attorney also learned the information that Adams might convey—both the good (that Fields's PCP use may have made it less likely that he could unscrew Horton's window) and the bad (that Fields's

PCP use made it more likely that Fields committed the gruesome murder). Given how damaging Adams's testimony might have been, the Kentucky Supreme Court could reasonably hold that counsel objectively did enough to make further "investigation[]" into this issue "unnecessary." *Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 691).

D. Penalty-Phase Mitigation Evidence

1. Fields switches to the penalty phase, arguing that his counsel wrongly failed to introduce enough evidence in mitigation to avoid the death penalty. One of his attorneys developed a large amount of mitigating evidence before trial. This lawyer thoroughly investigated Fields's childhood. He spoke with Fields's mother, brothers, and neighbors and tracked down Fields's records from a child-welfare agency. Counsel uncovered that Fields had suffered a "fairly significant" amount of abuse from his father. Baker Tr., R.89-3, PageID 13581. His father, for example, threw him through a wall. Fields's brothers likewise had abused him by, among other things, locking him in a refrigerator and hanging him by a noose. His mother also had a substance-abuse problem and abandoned Fields at times in his youth. And Fields had developed his own substance-abuse problem by the age of 12.

Apart from the investigation into Fields's background, counsel retained two experts: Drs. Peter Schilling and Adams. Schilling, a psychologist, would have discussed how Fields's "traumatic" childhood could explain the murder of Horton. *Id.*, PageID 13578–79. As noted, Adams would have discussed the effects of Fields's PCP use.

At trial, however, Fields's counsel chose to present only a fraction of this evidence. Fields insisted that his lawyers offer "[a]bsolutely nothing" in terms of mitigation because he believed it would make him "look guilty." *Id.*, PageID 13611–12. And although the trial court had ruled that counsel—not Fields—had the decision-making authority over whether to introduce mitigating evidence, counsel sought to respect their client's wishes as much as they could. In addition, the jury had deliberated for eight hours before finding Fields guilty. So counsel believed that Fields could put on a "lingering doubt" defense. *Id.*, PageID 13595, 13616. But much of the mitigating evidence sought to explain why Fields committed the murder and would have cut against this defense. As a "hybrid solution," then, counsel decided to have only

Fields's mother and brother testify about his abusive childhood to humanize him before the jury without implying his guilt. *Id.*, PageID 13617.

In his post-conviction motion, Fields argued that the lawyer in charge of his penalty phase had provided ineffective assistance by failing to present all of the mitigating evidence that he had gathered, including the testimony of Drs. Schilling and Adams and additional lay witnesses. *See Fields*, 2014 WL 7688714, at *13–15. The Kentucky Supreme Court rejected this third ineffective-assistance claim. *See id.* To do so, the court found it necessary to "explain the situation [Fields's counsel] was placed in." *Id.* at *13. The attorney had developed a significant case in mitigation, but Fields adamantly opposed this evidence. *Id.* "In an attempt to compromise," the attorney thus chose to limit the mitigating evidence "to that which was reasonably necessary." *Id.* The court found counsel's compromise "reasonable under the circumstances." *Id.* at *14.

2. The Kentucky Supreme Court did not unreasonably apply *Strickland* or its progeny by holding that counsel reasonably presented minimal mitigating evidence. Most notably, the U.S. Supreme Court has repeatedly faulted trial lawyers who failed to adequately *investigate* for the penalty phase and thereby overlooked substantial mitigating evidence. *See, e.g.*, *Andrus v. Texas*, 140 S. Ct. 1875, 1881–83 (2020) (per curiam); *Porter v. McCollum*, 558 U.S. 30, 39–40 (2009) (per curiam); *Wiggins*, 539 U.S. at 521–34; *Williams v. Taylor*, 529 U.S. 362, 395–96 (2000); *see also Goodwin v. Johnson*, 632 F.3d 301, 323–26 (6th Cir. 2011). But this caselaw has no application here. As the state trial court noted, Fields's penalty-phase lawyer "prepared to present an extensive mitigation" case. Op., R.33-2, PageID 9499. Indeed, this attorney developed the very evidence on which Fields now relies to argue his ineffectiveness.

Rather than implicate counsel's investigation, Fields's claim implicates counsel's choice not to introduce the known mitigating evidence. And a "fairminded jurist" could hold that counsel decided not to introduce this evidence for a "strategic" reason that courts must treat as "virtually unchallengeable" under *Strickland*. *Kayer*, 141 S. Ct. at 524; *Strickland*, 466 U.S. at 690. As an initial matter, Fields identifies no Supreme Court precedent holding that counsel performs deficiently by considering a client's informed wishes not to present a case in mitigation. If his counsel had put on a robust mitigation case conceding that Fields murdered

Horton, Fields may well have argued that this lawyer violated his right to make this major decision. *See McCoy v. Louisiana*, 138 S. Ct. 1500, 1507–09 (2018). But as far as we can tell, the Supreme Court has yet to decide whether an attorney or a client decides whether to present a case in mitigation. *Cf. Schriro v. Landrigan*, 550 U.S. 465, 469–70, 476–77 (2007). But many lower courts have held that a defendant can voluntarily "waive the presentation of mitigating evidence." *Soto v. Commonwealth*, 139 S.W.3d 827, 855 (Ky. 2004) (citing cases). So the Kentucky Supreme Court could reasonably conclude that counsel's efforts to broker a "compromise"—in which counsel would present evidence from Fields's mother and brother about his traumatic background without implying his guilt—was a valid strategy. *Fields*, 2014 WL 7688714, at *13.

Next, Fields identifies no Supreme Court precedent holding that counsel acts unreasonably by omitting known mitigating evidence that could have conflicted with the decision to pursue a "lingering doubt" defense at the penalty phase. *Id.* at *14; *cf. Lockhart v. McCree*, 476 U.S. 162, 181 (1986). To the contrary, circuit decisions have credited this residual-doubt theory. *See, e.g.*, *Franks v. GDCP Warden*, 975 F.3d 1165, 1177 (11th Cir. 2020); *Cox v. Ayers*, 613 F.3d 883, 898 (9th Cir. 2010). And much of the testimony from Drs. Schilling and Adams would have sought to "justify[] the crime" rather than support the theory that Fields did not do it. *Fields*, 2014 WL 7688714, at *14. As counsel explained, this testimony could have harmed a residual-doubt defense. The jurors might have looked unfavorably on the contradictory penalty-phase claim that "I'm innocent, but oh, now, let me tell you why I did it." Baker Tr., R.89-3, PageID 13595.

In response, Fields cites counsel's testimony that "residual doubt" was not his "mitigation theory." Appellant's Br. 102. Fields takes counsel's testimony out of context. Yes, residual doubt was not the *original* theory. That is why counsel developed substantial mitigating evidence. But counsel changed to this residual-doubt theory based on a combination of Fields's insistence not to present mitigating evidence and the jury's lengthy deliberations at the guilt phase.

Fields next argues that the testimony from the two experts did not necessarily conflict with a residual-doubt defense. As we have noted, Adams's testimony about Fields's PCP use

might have made it less likely that Fields could unscrew Horton's window. And Dr. Schilling's testimony about Fields's childhood might have had only a "sympathetic effect" on the jury. Baker Tr., R.89-3, PageID 13583. But the jury also could have viewed the testimony from both experts as explaining why Fields violently murdered Horton. As counsel noted with respect to Dr. Schilling: "Having been through a traumatic background, much like post-traumatic stress, that would be an explanation of why this event happened on this day[.]" *Id.*, PageID 13584. And a state court could reasonably hold that the decision not to present this "double-edged" evidence was a "virtually unchallengeable" strategic choice. *Id.*, PageID 13620; *Strickland*, 466 U.S. at 690.

Fields also argues that the state trial court had decided that counsel (not Fields) had the ultimate call on what mitigating evidence to present. And once counsel chose to introduce some mitigating evidence, Fields says, counsel had a duty to present the "best possible mitigation case" with the expert testimony. Appellant's Br. 105. Yet Fields cites no Supreme Court precedent that would have required counsel to adopt this "in for a penny, in for a pound" approach to mitigating evidence. *See Neder v. United States*, 527 U.S. 1, 17 n.2 (1999). It is not at all clear that the state trial court correctly decided who controls this defense. And a fairminded jurist could have found counsel's "compromise" solution eminently reasonable given the "situation" in which counsel found himself. *Fields*, 2014 WL 7688714, at \*13. So we have no basis to overturn the Kentucky Supreme Court's rejection of this claim under AEDPA.

## IV. Parole-Statistics Claim

Fields lastly alleges that the state trial court violated his constitutional rights at the penalty phase by prohibiting him from introducing statistics showing the low likelihood that he would ever get paroled if sentenced to life imprisonment. Yet again, however, the Kentucky Supreme Court rejected this claim. And yet again, Fields cannot satisfy AEDPA's demanding standards.

At the time of Fields's trial, Kentucky law allowed his jury to choose from four possible punishments: 20 years in prison; a life sentence with no statutory limits on his parole eligibility; a life sentence without the possibility of parole for 25 years; and a death sentence. Before trial,

Fields moved the state trial court to allow him to present statistics at the penalty phase that would have shown how often Kentucky's parole board had released other convicted murderers sentenced to life imprisonment. In the experience of Fields's counsel, jurors often wrongly believe that a defendant will quickly get paroled if they impose a life sentence. But Kentucky's parole board has historically granted parole to less than 25% of murderers sentenced to life. Although the trial court agreed that jurors "are often confused about this parole issue," it felt bound by existing state law to deny the motion. Tr., R.29-10, PageID 3633–35. The Kentucky Supreme Court affirmed. *Fields*, 274 S.W.3d at 419. It reasoned that Fields's statistics had "little relevancy" to his case. *Id.*

According to Fields, the Kentucky Supreme Court's decision unreasonably applied two separate lines of Supreme Court cases. But neither line clearly applies here.

Start with the first line of cases on which Fields relies. The Supreme Court has often considered cases in which the prosecution requests a death sentence based on a defendant's future dangerousness. *See Simmons v. South Carolina*, 512 U.S. 154, 157 (1994) (plurality opinion). To minimize a jury's future-dangerousness concerns, defense attorneys have often sought to respond that state law would bar the defendant from ever getting paroled if given a life sentence. *See id.* at 158–59. At one time, a few States barred the jury from learning of this accurate information about state parole law. *See id.* at 167. Beginning in *Simmons*, the Court has repeatedly held that due process requires a court to instruct a jury that state law makes the defendant parole ineligible once prosecutors put the defendant's future dangerousness at issue. *See id.* at 161–66; *id.* at 176–78 (O'Connor, J., concurring in the judgment); *see also Kelly v. South Carolina*, 534 U.S. 246, 251–58 (2002); *Shafer v. South Carolina*, 532 U.S. 36, 48–51 (2001).

Here, however, the Kentucky Supreme Court did not unreasonably apply *Simmons* and its progeny for a simple reason: Kentucky law did not make Fields ineligible for parole. If the jury had imposed a life sentence, Fields would have become eligible in 25 years at the latest. So the argument that *Simmons* accepted (that defendants have a right to tell the jury that they are *legally ineligible* for parole) differs from Fields's argument (that he had a right to tell the jury that he was *practically unlikely* to receive parole). And AEDPA bars any theory that the Kentucky

Supreme Court wrongly refused to "extend" *Simmons*'s formalistic rule to cover Fields's pragmatic argument. *Woodall*, 572 U.S. at 425–26; *see Atkins v. Crowell*, 945 F.3d 476, 479 (6th Cir. 2019).

Indeed, the Supreme Court has already made this point. In the AEDPA context, it refused to read *Simmons* as adopting a "functional approach" that would require state courts to predict "whether it looks like the defendant will turn out to be parole ineligible." *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000) (plurality opinion); *see id.* at 180–81 (O'Connor, J., concurring in the judgment). The plurality instead read *Simmons* to create a clear "rule" requiring courts to notify a jury of a defendant's parole ineligibility "only when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law." *Id.* at 166 (plurality opinion). The alternative approach would impractically force courts to consider anything that might affect a prisoner's release, including the prisoner's "age or health[.]" *Id.* at 169. After *Ramdass*, then, many courts have refused to accept "functional" claims that defendants have the right to convince juries that they are "effectively" ineligible for parole. *Campbell v. Polk*, 447 F.3d 270, 287–89 (4th Cir. 2006); *see Bates v. Sec'y, Fla. Dep't of Corrs.*, 768 F.3d 1278, 1300–06 (11th Cir. 2014); *People v. Bannister*, 902 N.E.2d 571, 587–89 (Ill. 2008). *Ramdass* and these other decisions confirm that "fairminded jurists" could reject Fields's argument that *Simmons* applied to his case even though he could have been paroled if given a life sentence. *Kayer*, 141 S. Ct. at 524.

Turn to the second line of cases on which Fields relies. The Supreme Court has held that the Eighth Amendment allows capital defendants to introduce "all relevant mitigating evidence" at the penalty phase of their trials. *Eddings v. Oklahoma*, 455 U.S. 104, 117 (1982); *Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (plurality opinion). *Eddings* thus found that a state court wrongly refused to consider the defendant's "difficult family history" and "emotional disturbance" when deciding whether to sentence him to death. 455 U.S. at 115. And a plurality in *Lockett* found a state statute unconstitutional because it did not permit sentencers to consider evidence about the "defendant's character or record" or the "circumstances of the offense" when deciding whether to impose the death penalty. 438 U.S. at 604 (plurality opinion).

But the Kentucky Supreme Court did not unreasonably apply this rule requiring courts to admit all "relevant mitigating evidence" at the penalty phase. *Eddings*, 455 U.S. at 117. Fields ignores a critical word in this command: "relevant." The Supreme Court's holding that a defendant's "family history" and the "circumstances" of the defendant's "offense" are relevant mitigating factors says nothing about whether a parole board's decision to deny parole to *other* defendants is also relevant. *Eddings*, 455 U.S. at 115; *Lockett*, 438 U.S. at 604 (plurality opinion). And the Kentucky Supreme Court could reasonably conclude the contrary. A parole decision in any given case is "inherently individualized," so general statistics about the "average" resolution say little about a "particular" defendant's chances. *Young v. Commonwealth*, 129 S.W.3d 343, 345 (Ky. 2004). In addition, the legal rule from *Eddings* and *Lockett* stems from the need for an "individualized decision" that accounts for the "uniqueness" of the defendant. *Lockett*, 438 U.S. at 605 (plurality opinion); *Eddings*, 455 U.S. at 110. But Fields's general statistics could have turned his penalty phase into a trial about different murders. The statistics also could have led the jury to engage in speculative comparisons between Fields and other defendants and thus "distracted" it from the main issue of whether Fields's unique crime and background warranted the ultimate punishment. *Ramdass*, 530 U.S. at 169 (plurality opinion); *see Bates*, 768 F.3d at 1306. At the least, "fairminded jurists" could reach these conclusions. *Kayer*, 141 S. Ct. at 524.

\* \* \*

Fields brutally murdered Bess Horton 30 years ago. A jury convicted him of this murder a second time 20 years ago. The Kentucky courts have given him substantial process in the ensuing decades. Their conscientious consideration of Fields's many claims does not remotely reveal the type of "extreme malfunction[]" in Kentucky's criminal-justice system that could permit us to grant relief under AEDPA. *Donald*, 575 U.S. at 316 (citation omitted).

We affirm.

——————————

**DISSENT**

——————————

KAREN NELSON MOORE, Circuit Judge, dissenting. A jury condemned Samuel Fields to death for killing Bess Horton in a small eastern Kentucky town during the summer of 1993. Although police discovered Fields covered in blood in the home where Horton was killed, the blood on Fields was his own, the product of an injury sustained earlier in the night, and none of it was found on Horton, even though Fields had trailed it on the sidewalk, back steps, and porch handle leading to Horton's house. Horton's blood was not found on Fields either, yet Horton's medical examiner testified that because Horton died of stab wounds to her carotid artery and jugular vein, the person who killed her should have had her blood on them. Fields did confess to the crime when police confronted him at the scene, but he did so while apparently undergoing hallucinations caused by PCP. The same night, he also confessed to killing his brother—a verifiably false claim because his brother was alive and well. Ever since, Fields has strenuously maintained his innocence, doing so with such adamance that he even forbade his legal team from pursuing an intoxication defense at trial, a strategy that could have mitigated his culpability of first-degree murder or helped him avoid the death penalty for a crime he was accused of committing while suffering a drug-induced psychotic break at the age of twenty-one. Meanwhile, two witnesses testified that Fields's girlfriend at the time also confessed to killing Horton, and the evidence adduced at trial showed that she had both motive and opportunity to commit the crime.

The questions raised by these gaps in the evidence against Fields weighed so heavily on the jurors' minds that they decided to conduct an experiment in the jury room to test the prosecution's theory of the case. The crux of Fields's trial revolved around the prosecution's theory that Fields broke into Horton's home in the middle of the night using a butter knife with a twisted tip—known as the "twisty knife"—to unscrew seventeen paint-covered screws from a storm window in the span of less than seventeen minutes while he was severely intoxicated. Using the twisty knife, the jurors unscrewed the door from a cabinet in the jury room. After

confirming through this experiment that the prosecution's theory was plausible, the jury found Fields guilty of murder and sentenced him to death.

The majority decides that such experiments, involving the consideration of extrinsic evidence, are constitutionally permissible. Because it is clearly established that jurors cannot rely on extrinsic evidence in reaching their verdict, I cannot agree. The result of the majority's opinion is that juries may decide to convict defendants and sentence them to death based on evidence that is not in the record, is untested by the adversarial process, and is unable to be impeached or rebutted by the defense. Such a result is constitutionally intolerable. Because Fields suffered prejudice from this grave error, I would reverse the district court's denial of habeas relief as to Fields's jury-experiment claim and remand to the district court with instructions to conditionally grant Fields's petition for writ of habeas corpus as to that claim. I therefore respectfully dissent.

## I.  JURY-EXPERIMENT CLAIM

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" if the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state-court decision is contrary to clearly established federal law if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state-court decision unreasonably applies clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08. "'[C]learly established Federal law' . . . refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as

of the time of the relevant state-court decision." *Id.* at 412 (quoting 28 U.S.C. § 2254(d)). The Supreme Court has cautioned that "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'" *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in the judgment)). Thus, the fact "[t]hat the standard is stated in general terms does not mean the application was reasonable." *Id.*

## B. Violation of Fields's Due Process, Confrontation, and Fair Trial Rights

### 1. AEDPA Deference

Fields argues that the Kentucky Supreme Court unreasonably applied clearly established federal law in its review of his challenge to the jury's use of extrinsic evidence in the experiment conducted by jurors during deliberations. It is clearly established that jurors may not consider extrinsic evidence in reaching their verdict. *See Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965) ("In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."); *Parker v. Gladden*, 385 U.S. 363, 364–65 (1966) (per curiam). The Supreme Court has long held that a defendant's Sixth and Fourteenth Amendment rights are violated when jurors consider extrinsic evidence, because the jury's "verdict must be based upon the evidence developed at the trial." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Turner*, 379 U.S. at 472–73; *Parker*, 385 U.S. at 364–65. As the Court has explained, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907).

We have long recognized that it is clearly established Supreme Court law that a defendant's federal constitutional rights are violated by jurors' consideration of extrinsic evidence. *Doan v. Brigano*, 237 F.3d 722, 733–34 n.7 (6th Cir. 2001). In *Doan*, a juror "conducted an experiment in her own home during the trial to see if [the defendant] was telling the truth" about being unable to see bruises on his girlfriend's daughter's body on the night of

her death. *Id.* at 726–27. The juror "put lipstick on her arm to simulate a bruise, and attempted to view the 'bruise' in a room lit similarly to the rooms that [the child] was in that evening." *Id.* at 727. The juror then informed the rest of the jury that the bruise was visible in her experiment, thus contradicting the defendant's testimony. *Id.* Concluding that the experiment violated the rule of *Parker* and *Turner*, this court held that such "an out-of-court experiment, however, conflicts with [the defendant's] constitutional right to a fair and impartial jury that considers only the evidence presented at trial." *Id.* at 733. Thus, "as a matter of law, clearly established Supreme Court precedent requires that a criminal defendant be afforded the right to confront the evidence and the witnesses against him, and the right to a jury that considers only the evidence presented at trial." *Id.* at 733–34 n.7.

As the *Doan* court explained, this rule is among the most "undeviating" and "fundamental requirements of a constitutionally fair trial." *Id.* at 731 (quoting *Parker*, 385 U.S. at 364–65). The Sixth Amendment right to "trial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* (quoting *Turner*, 379 U.S. at 472–73). These safeguards are essential because, in the words of Judge Friendly, to "the greatest extent possible all factual material must pass through the judicial sieve, where the fundamental guarantees of procedural law protect the rights of those accused of crime." *Id.* at 734 (brackets omitted) (quoting *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970)). "Several circuits" have agreed, recognizing "that a jury's consideration of extraneous material violates a defendant's constitutional rights." *Id.* at 735.

This court has repeatedly reaffirmed the central holdings of *Doan*. *See Fletcher v. McKee*, 355 F. App'x 935, 937 (6th Cir. 2009); *Mammone v. Jenkins*, 49 F.4th 1026, 1045–46 (6th Cir. 2022). Citing *Doan*, *Fletcher* held that "under clearly established federal law, jury exposure to extrinsic evidence or other extraneous influence violates a defendant's Sixth Amendment rights, and a state court decision that conflicts with this rule may justify habeas relief under the standard set forth in the AEDPA." 355 F. App'x at 937 (citation omitted). And recently, this court reiterated that "[a] jury's verdict must be based on the evidence introduced at

trial, not extraneous information." *Mammone*, 49 F.4th at 1045–46 (citing *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Thompson v. Parker*, 867 F.3d 641, 647 (6th Cir. 2017)). *Mammone* also approvingly cited *Doan* for the proposition that "a juror's injection of extraneous evidence conflict[s] with Supreme Court precedent recognizing a defendant's constitutional right to confront the witnesses and evidence against him." *Id.* at 1045. I would therefore continue to adhere to our long line of precedent holding that such consideration of extrinsic evidence by jurors violates a defendant's federal constitutional rights.

The warden criticizes Fields for relying on *Doan* and *Fletcher*, arguing that under 28 U.S.C. § 2254(d), only Supreme Court precedent constitutes clearly established federal law. Appellee Suppl. Br. at 11; Appellee Br. at 39. Although it is true that prior decisions by federal courts of appeals do not constitute clearly established federal law within the meaning of AEDPA, it is perfectly permissible under AEDPA to rely on "prior Sixth Circuit determinations that a rule has been clearly established [by the Supreme Court]." *Tolliver v. Sheets*, 594 F.3d 900, 916 n.6 (6th Cir. 2010). The Supreme Court has long confirmed that this practice comports with the requirements of AEDPA. *See Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam). That is because "an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Id.*

Unlike the warden, the majority recognizes *Doan*'s binding force, but it "reject[s] *Doan*'s holding" for speaking at too high a "'level of generality.'" Maj. Op. at 20 (quoting *Brown v. Davenport*, 596 U.S. 118, 136 (2022)). Although it agrees "that a jury's verdict must rest on 'the evidence developed at the trial,'" it identifies a "wide divergence" in lower courts' application of this general rule against extrinsic evidence to the specific context of jury experiments. *Id.* at 17 (quoting *Turner*, 379 U.S. at 472). It therefore concludes that the Supreme Court cannot have clearly established a rule prohibiting juries from experimenting with extrinsic evidence. *Id.* at 17–18.

The Supreme Court has explained, however, that it may articulate clearly established law in the form of "a general standard." *Marshall*, 569 U.S. at 62 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Just as lower courts may not "transform" a "narrow holding[]" into

"a broad" one, Maj. Op. at 16 (emphasis omitted) (quoting *Jackson*, 569 U.S. at 512), neither may they whittle general principles into overly specific rules, *see Marshall*, 569 U.S. at 62. Construing the right to a verdict based only upon the evidence developed at trial as a general one does not license lower courts to narrow it. Indeed, the Supreme Court has been "undeviating" in enforcing the right, *Parker*, 385 U.S. at 364 (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966)), and so must we, under our duty to apply "clearly established Federal law, as determined by the Supreme Court." *See* 28 U.S.C. § 2254(d)(1). Accordingly, I would adhere to our prior holding in *Doan* that the Supreme Court has clearly established a right to be convicted only upon the evidence introduced at trial—a right that a conviction based upon jury experimentation with extrinsic evidence violates.

The warden next suggests that because the Kentucky Supreme Court relied on this court's decisions in *Fletcher* and *United States v. Avery*, 717 F.2d 1020 (6th Cir. 1983), its conclusion cannot be an unreasonable application of clearly established federal law. Appellee Suppl. Br. at 13–15. But there is a critical distinction between the facts of those cases and what occurred during jury deliberations at Fields's trial: the jurors in *Fletcher* and *Avery* were not exposed to extraneous evidence, while the jurors that convicted Fields and sentenced him to death *were* exposed to such evidence. In *Avery*, the defendant did "not allege that the jurors were exposed to any extraneous materials during their deliberations," but instead simply contended that it was prosecutorial misconduct for the prosecutor to suggest in closing argument that jurors attempt an experiment. 717 F.2d at 1026. And in *Fletcher*, the jury-room reenactment did "not result in the creation of extrinsic evidence." 355 F. App'x at 939. The decisions in *Avery* and *Fletcher* are therefore inapposite here, where the jury conducted an experiment using evidence that was not admitted and thus was not subject to the procedural safeguards of trial.

Indeed, the Kentucky Supreme Court's decision is unreasonable precisely because it ignored the dispositive issue: that jurors had relied on extrinsic evidence in deliberations. Citing *Fletcher*, the state court held "that jurors are free to use their own senses, observations, and experiences to conduct an experiment or reenactment with already admitted evidence." *Fields v. Commonwealth* ("*Fields II*"), 2013-SC-000231-TG, 2014 WL 7688714, at *4 (Ky. Dec. 18, 2014). The Kentucky Supreme Court thus concluded that "[t]his is exactly what the jury did in

conducting its experiment." *Id.* That conclusion constitutes an unreasonable application of clearly established Supreme Court law because there is a clear difference between merely examining evidence that is already in the record and using unadmitted objects in the jury room as part of an experiment to prove the commonwealth's theory of the case.

The jurors in Fields's case did not simply "conduct an experiment . . . with already admitted evidence." *Id.* The cabinet on which the jurors conducted the experiment was not admitted into evidence. The screws on the cabinet were unpainted, universal screws, whereas the screws on the storm window were painted Phillips head screws. If Fields had removed the screws from the storm window, he did it in the dark, at night, with a blood alcohol content greater than .14, after an evening of smoking marijuana and, the evidence suggests, ingesting PCP. Presumably none of those conditions were present during the jury's experiment. And there is no evidence to suggest—among other considerations—whether the cabinet door was hanging at a similar height to the storm window, whether screws in a cabinet door are installed with the same tension as the screws in a storm window, or whether the screws were fastened to the cabinet door in a different manner than the screws in the storm window.

"[S]tate courts must reasonably apply the rules 'squarely established' by th[e] [Supreme] Court's holdings to the facts of each case." *White v. Woodall*, 572 U.S. 415, 427 (2014) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The Kentucky Supreme Court failed to do so. Instead, I conclude that it unreasonably applied clearly established federal law by failing to address the fact that the jury was unconstitutionally exposed to extraneous evidence that Fields had no opportunity to refute.

## 2. Merits

Once a petitioner's claim overcomes the relitigation bar imposed by 28 U.S.C. § 2254(d), federal courts apply de novo review, because no deference is owed to a state-court decision premised upon an unreasonable application of clearly established federal law. *See Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011). Reviewing Fields's claim de novo, it is plain that Fields's confrontation, due-process, and fair-trial rights were violated by the jury's improper consideration of extrinsic evidence during the jury-room experiment.

It is undisputed that the jury considered extrinsic evidence during the experiment.  *See* Appellee Br. at 12, 21; Appellee Suppl. Br. at 7.  The parties agree that the jurors conducted the experiment on the jury-room cabinet, which had not been admitted into evidence.  It is also undisputed that Fields did not have the opportunity to confront that evidence.  And as explained above, there were several material differences between the extrinsic evidence used in the jury experiment and the facts alleged by the prosecution in its theory of the offense.

The warden suggests that the rule of *Parker* and *Turner* is too generalized to apply to the facts of this case.  Appellee Suppl. Br. at 6.  But the Supreme Court has held that AEDPA "permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).  This is a straightforward application of a general principle to the facts of the case.  The Supreme Court has clearly established that jurors may not consider extrinsic evidence in reaching their verdict.  *See Turner*, 379 U.S. at 472–73; *Parker*, 385 U.S. at 364–65.  The jurors in Fields's case considered extrinsic evidence when they conducted the experiment in the jury room.  Doing so violated Fields's rights under the Sixth and Fourteenth Amendments.

## C. Prejudice

Fields is entitled to relief on his claim only if he can demonstrate prejudice, which in turn requires that he meet two separate tests.  First, as the Supreme Court recently explained in *Davenport*, if the state court has adjudicated the harmless error question on the merits, AEDPA deference applies and the petitioner "must satisfy § 2254(d)(1) to secure federal habeas relief." 596 U.S. at 127.  Because the Kentucky Supreme Court addressed this issue on the merits, Fields must demonstrate that "that court applied *Chapman* [*v. California*, 386 U.S. 18 (1967),] 'in an "objectively unreasonable" manner.'"  *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (quoting *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam)).  Second, Fields must satisfy the requirements of *Brecht v. Abrahamson* by showing that the error had a "substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Under *Brecht*, a petitioner must establish that the error "resulted in 'actual prejudice.'" *Id.*

**1. AEDPA Deference**

The Kentucky Supreme Court's harmless-error determination was contrary to clearly established federal law because it "applie[d] a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams*, 529 U.S. at 405. Instead of applying the correct standard under *Chapman*, the Kentucky Supreme Court reversed the standard, and imposed a test that was substantially more burdensome to Fields.

Under *Chapman*, the burden falls on "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24; *see also Brecht*, 507 U.S. at 630 (confirming that under *Chapman*, "[t]he State bears the burden of proving that an error passes muster"). In other words, because the commonwealth benefitted from the violation of Fields's federal constitutional rights, the Kentucky Supreme Court ought to have placed the burden on the commonwealth to prove beyond a reasonable doubt that the jury experiment did not contribute to the verdict. It did not. Instead, the state court placed the burden on Fields, concluding that "we cannot say beyond a reasonable doubt that the jury experiment contributed to the verdict." *Fields II*, 2014 WL 7688714, at *4. The burden should not have been placed on Fields to prove beyond a reasonable doubt that the error did contribute to the verdict obtained. By applying a test for harmless error that contradicted *Chapman*, the Kentucky Supreme Court's analysis was contrary to clearly established federal law.

**2. *Brecht* Analysis**

Applying the *Brecht* standard, I believe that Fields suffered actual prejudice resulting from the jury's consideration of extrinsic evidence during the jury-room experiment. At trial, the commonwealth's theory of the offense was that Fields unscrewed seventeen paint-covered screws from the storm window with the twisty knife, broke into Horton's home, and then stabbed Horton to death, all within a very short period of time. *Fields II*, 2014 WL 7688714, at *2. The defense theory was that "given his intoxicated state, Fields would not have been able—during the timeframe in question—to break into the house, sneak up on Ms. Horton, and commit the murder," and that he instead entered the home to rob it after Horton was already dead. *Fields v.*

*White* ("*Fields III*"), No. 15-38-ART, 2016 WL 3574396, at \*5 (E.D. Ky. June 23, 2016).  The issue of Fields's ability to unscrew the screws on the storm window was therefore central to the commonwealth's case against him at trial.

The importance of this issue is demonstrated by the prosecution's repeated focus on the timeline of events throughout Fields's trial.  During opening statements, the commonwealth emphasized how long Fields would have had to unscrew the storm window:

> I'd like for all of us to just see how long a minute can be.  And when the secondhand gets to the 10, I'm going to stop talking.  Now.  And that's been about thirty seconds.  Do you think that's enough time to take a screw, a little Phillips head screw, a little short Phillips head screw, out of a piece of wood?  Forty seconds.  Fifty seconds.  That's a minute.  And I don't mean to be melodramatic here or, you know, playacting or anything, but it's important for us to keep how long one minute can be.

R. 30-13 (Trial Tr. at 1845) (Page ID #5888).  The commonwealth again raised this theme in closing arguments:

> This is the window through which the Defendant went.  And you know we have heard, and you're going to hear—you get to look at these screws, seventeen screws.  That's a lot of screws.  To do it with a knife, sure.  That—You know, that's one of the things about this case.  We don't get to make up the facts, but these are the facts.  It takes a person who really wants to get in to use this knife.  You know, remember my overdramatic, let's wait a minute and see how long a minute is, in the opening statement that I gave so many—so long ago.  Well, I think you now—you understand what I was talking about in that.  A minute is a long—can be a long period of time.  And let's say—let's give the Defendant seventeen minutes from let's say 2 o'clock.  That gives him five minutes to get from the front—from the street there on Second Street across the parking lot to Ms. Horton's and around the house and up to the front.  So, let's start that clock at 2 o'clock.  And let's give him a minute per screw.  That gets him in the house at 2:17.

R. 30-23 (Trial Tr. at 3393) (Page ID #7478).  At the heart of the commonwealth's theory of events was the idea that, given the short timeframe, "there wasn't any opportunity for anyone else to have done this [offense]."  R. 30-13 (Trial Tr. at 1844) (Page ID #5887).

The record shows that this issue weighed heavily on jurors' minds throughout the trial.  During the trial, a juror asked the judge to pose the following question to a defense witness:

"How long does it usually take to install a large storm window?" R. 57-10 (Juror Questions) (Page ID #11862). A juror later testified at Fields's postconviction hearing that the purpose of the experiment was to test the commonwealth's theory and "see if it was possible to be done." R. 89-3 (Postconviction Hr'g Tr. at 14) (Page ID #13515). Another juror testified at the postconviction hearing "that [the experiment] wasn't what, you know, said that he was guilty or not guilty, but it just satisfied my mind that it was possible that you could have done that." *Id.* at 21 (Page ID #13522). The juror further explained that "I knew a man's life hanged in the balance, and I wanted to be sure of everything." *Id.* The same juror stated in an affidavit that the "experiment helped prove that Mr. Fields could have committed the crime."[1] R. 33-1 (Hall Aff. ¶ 4) (Page ID #8928). Thus, the jury's experiment was plainly intended to resolve the central issue at trial, and the "results" of the experiment undermined the defense's theory and credibility while bolstering the commonwealth's timeline of events and explanation for how Fields would have committed the murder.

The warden argues that the juror's testimony "that [the experiment] wasn't what . . . said that he was guilty or not guilty," R. 89-3 (Postconviction Hr'g Tr. at 21) (Page ID #13522), undermines Fields's prejudice arguments, Appellee Suppl. Br. at 19–20. But a juror's subjective evaluation of the impact that the experiment had on jury deliberations bears minimal weight on this court's prejudice analysis. That is because whenever a due-process error "'involves such a probability that prejudice will result . . . ,' little stock need be placed in jurors' claims to the contrary." *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) (quoting *Estes v. Texas*, 381 U.S. 532, 542–43 (1965)) (internal citation omitted). Thus, "[e]ven though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused." *Id.* "[T]he question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Id.* (quoting *Estelle v. Williams*, 425 U.S. 501, 505 (1976)). Such an unacceptable risk was presented here, given the highly prejudicial nature of the experiment.

---

[1]The Kentucky Supreme Court considered both the jurors' affidavits and their testimony at the postconviction hearing. *Fields II*, 2014 WL 7688714, at *3.

The warden further argues that Fields was not prejudiced because "the evidence of Fields's guilt was substantial." Appellee Suppl. Br. at 20. But both the state trial court and the Kentucky Supreme Court disagree with that assessment. On direct appeal following Fields's first trial, the Kentucky Supreme Court stated that "the evidence of [Fields's] guilt of murder was not overwhelming." *Fields v. Commonwealth ("Fields I")*, 12 S.W.3d 275, 281 (Ky. 2000). And after the culpability phase of Fields's second trial, the trial court commented that "[i]t would not have totally surprised me if the result had c[o]me out different." R. 54-1 (Ex Parte Hr'g Tr. at 5) (Page ID #11221).

Those courts are correct. Fields's presence in Horton's home was the only physical evidence that connected him to the murder. It is undisputed that Fields was bleeding that night— he had shattered a glass window with his hand and the officers found his blood on the sidewalk, the back porch steps, and the front porch handle of Horton's residence. *Fields III,* 2016 WL 3574396, at *4. And the medical examiner testified that, because one of Horton's wounds transected her right carotid artery and jugular vein, it was probable that the person who inflicted Horton's wounds would have her blood on them. R. 30-21 (Trial Tr. at 3019) (Page ID #7095). Despite those facts, subsequent testing revealed that none of Fields's blood was found on Horton and none of Horton's blood was found on Fields. R. 30-16 (Trial Tr. at 2367–69, 2373–76) (Page ID #6422–24, 6428–31); R. 30-17 (Trial Tr. at 2414–16, 2437–38) (Page ID #6474–76, 6497–98).

There was also no physical evidence supporting the commonwealth's theory that Fields used the twisty knife to break into Horton's home through the storm window. The commonwealth's own expert testified that the paint on the twisty knife did not match the paint on the painted screws on Horton's storm window. R. 30-16 (Trial Tr. at 2332) (Page ID #6387). And another of the commonwealth's experts testified that Fields's fingerprints were not found on the storm window. R. 30-17 (Trial Tr. at 2479–80) (Page ID #6539–40).

The main remaining evidence against Fields is his confessions. The Supreme Court has cautioned lower courts to be wary of convictions that rely solely on confessions. As the Court explained, "[w]e have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be

less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois*, 378 U.S. 478, 488–89 (1964) (footnotes omitted).

There is good reason to be suspicious of the reliability of Fields's confessions. Fields was extremely intoxicated at the time of his confessions, with a blood alcohol content of at least .14.[2] Fields had smoked marijuana earlier in the day, and there is some evidence that he consumed PCP, also referred to as "horse tranquilizers," which can have hallucinogenic effects. *Fields II*, 2014 WL 7688714, at *1. Less than an hour before law enforcement found him in Horton's home, Fields falsely confessed to Burton that he had killed his brother and needed to dispose of the alleged murder weapon. *Fields III*, 2016 WL 3574396, at *2. But Fields had not murdered his brother, and this supposed confession was false. *Id.* Likewise, Fields's confession to the EMT contained provably false statements that are uncorroborated by the physical evidence. The EMT testified that Fields stated "in no uncertain terms that if [the EMT] had killed some lady that [the EMT] would have blood on [him] as well." R. 30-15 (Trial Tr. at 2112) (Page ID #6163). But, again, none of Horton's blood was found on Fields. R. 30-16 (Trial Tr. at 2367–69, 2373–76) (Page ID #6422–24, 6428–31); R. 30-17 (Trial Tr. at 2414–16, 2437–38) (Page ID #6474–76, 6497–98). Fields's confessions are therefore suspect given his heavily impaired mental state. Once sober, Fields has continued to maintain his innocence.

Fields's confessions are particularly dubious given that he was not the only person to confess to Horton's murder. Two witnesses testified that Burton had confessed to killing Horton. R. 30-22 (Trial Tr. at 3198, 3207) (Page ID #7279, 7288). In the words of one of the witnesses, Burton "said, 'I was tired of that Son of a Bitch a telling me who I can have in my apartment and who I can't.', said, 'I killed her, and she can't tell me nothing.'" *Id.* at 3198 (Page ID #7279). And Burton had both the opportunity and the motive to murder Horton. *Fields III*, 2016 WL 3574396, at *5.

---

[2]Because Fields's blood alcohol content likely would have decreased during the time that he was in custody, his blood alcohol content was likely even higher at the time of his confessions. *See Missouri v. McNeely*, 569 U.S. 141, 152 (2013).

Thus, because the jury experiment was highly prejudicial to Fields and concerned the central issue at trial, and because the other evidence of Fields's guilt was sparse, the jury's consideration of extrinsic evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776). I conclude that Fields has demonstrated that actual prejudice resulted from the jury experiment, and I would therefore hold that Fields is entitled to relief on this claim.

## II.  CONCLUSION

The majority's opinion wrongfully approves of Fields's conviction and death sentence, even though Fields's jury reached its verdict after considering evidence that was not in the record and that Fields had no opportunity to challenge or rebut. Accordingly, I would reverse the district court's judgment denying habeas relief as to Fields's jury-experiment claim and remand to the district court with instructions to conditionally grant Fields's petition for a writ of habeas corpus as to that claim. Because I believe that the Constitution cannot tolerate criminal verdicts and death sentences imposed after the jury's consideration of prejudicial extrinsic evidence, I respectfully dissent.